583 P.2d 897

**The STATE of Arizona, Appellee,**

v.

**Dennis Lynn MILLION, Appellant.**

No. 4138.

Supreme Court of Arizona, In Banc.

July 27, 1978.

Bruce E. Babbitt, Former Atty. Gen., John A. LaSota, Jr., Atty. Gen. by William J. Schafer, III, and Georgia B. Ellexson, Asst. Attys. Gen., Phoenix, for appellee.

Paul Hunter, Yuma, Risner, Raven & Keller by Peter B. Keller, Tucson, for appellant.

CAMERON, Chief Justice.

This is an appeal from a judgment, following a jury trial, of guilt for the crime of transporting marijuana, A.R.S. § 36–1002.-07, and a sentence of from five years to five years and one day in the state prison.

We take jurisdiction pursuant to Rule 47(e)(5), Rules of the Supreme Court, 17A A.R.S.

We are asked to decide three issues:

1. Was defendant denied his rights to a speedy trial under Rule 8.2, Arizona Rules of Criminal Procedure, 17 A.R.S., or the Sixth Amendment to the United States Constitution?
2. Was the warrantless search of defendant's motor home vehicle based on probable cause and justified by exigent circumstances?
3. Did the defendant establish entrapment as a matter of law?

The facts necessary for a determination of these issues are as follows. Pursuant to an informant's tip that a certain house in Yuma, Arizona, was being used as a "stash house" for drug smuggling purposes, agents of the Federal Drug Enforcement Agency (DEA) began periodic surveillance of the house in the early part of May 1975. At approximately 1:00 p. m. on 12 May 1975, a DEA agent observed at the residence a tan motor home meeting the description of a vehicle reportedly used in drug trafficking operations. At approximately 11:00 p. m. that evening, the motor home was again seen at the house, backed into the carport. The carport area was well-lit and a light was shining within the vehicle. Using binoculars, two surveilling officers observed the defendant and two other suspects carrying dark-colored garbage bags and packing them in various compartments within the vehicle. Officer Martinez testified at the suppression hearing:

"Q What type of garbage bag—you have used the word garbage bag, what type of garbage bags were they you observed at first?

"A They were dark large type that you would put in an outside garbage can, dark green or black. They appeared very dark.

"Q Did they appear to be empty or full?

"A No, sir, they appeared to be containing various objects in them that were—that they would bend when they would carry them. The gar-

bage bags would bend and loose objects inside them could be observed.

"Q How would you describe these objects you saw in the bags?

"A Well, they are individual objects, not large. I would describe them as from prior experiences, as brick shaped objects.

"Q Have you seen these types of garbage bags on prior occasions?

"A Yes, sir.

"Q How many prior occasions?

"A A hundred or 150 times.

"Q Have those been in connection with investigations of marijuana?

"A Yes, sir.

"Q Is there anything unusual, anything common about the garbage bags, put it that way?

"A In this area it is most common to find garbage bags of this type to contain marijuana contraband. They are available everywhere.

"Q Is there some reason why garbage bags are used instead of cardboard boxes?

"A One thing, they contain the smell better. Second, they are waterproof. They are able to pack them in different configurations very readily by pushing and shoving them into different locations in the compartment. They put talcum on them to deaden the odor."

After the motor home was loaded, it was boarded by two of the suspects and driven to the Jet Cafe where it was parked. A Volkswagen driven by a third suspect followed the motor home to the Jet Cafe. All three suspects then rode in the Volkswagen to another residence where they remained for approximately one hour. They then returned to the cafe, spent a few minutes inside and then entered the motor home. The motor home was driven north toward the California border. Just before reaching the border, at approximately 1:15 a. m., the motor home was stopped by several officers representing the DEA, the Department of Justice, and the Yuma City-County Narcotics Task Force. A search of the vehicle

revealed kilo packages of marijuana totalling 1,238 pounds. The contraband was seized and the defendant and the other two occupants of the vehicle arrested.

Defendant was indicted on charges of transporting marijuana and possessing marijuana for sale on 15 May 1975, case number 7783. The defendant was granted two pretrial continuances and on 2 September 1975 the defendant's motion to suppress the use of evidence obtained as a result of the search of the motor home was granted by the trial court. On 9 September 1975, immediately prior to the time set for trial, the State filed a notice of appeal and the trial court, on the State's motion over the objection of the defendant, dismissed the case without prejudice.

On 23 September 1976, the Court of Appeals issued an opinion reversing the trial court's suppression order. See *State v. Million,* 27 Ariz.App. 490, 556 P.2d 338 (1976). In a motion for rehearing, the trial court's previous dismissal of the case without prejudice was pointed out to the Court of Appeals. The Court of Appeals thereupon (on 3 November 1976), vacated its opinion, stating:

"On rehearing, appellants have pointed out to us, for the first time, by means of a motion to dismiss the appeal that the State after the granting of the motion to suppress made a motion to dismiss the case which was granted by the trial court. That being so, the issues are moot.

"The motion to dismiss is granted, the appeal is dismissed and the opinion previously made by this court is vacated." *State v. Million,* supra, 27 Ariz.App. at 494, 556 P.2d at 342.

15 days later, on 18 November 1976, a new indictment based on the original charges was filed against the defendant, case number 8557. The trial court reconsidered its order granting the defendant's motion to suppress in the earlier case. It found that

"good cause does exist to reconsider the order previously made granting defendant's motion to suppress, that cause being

demonstrated by the opinion of the Court of Appeals rendered September 23, 1976." and ordered the motion to suppress denied. On 8 March 1977, 110 days after the new indictment was filed, the defendant's trial was commenced at the conclusion of which the jury returned verdicts of guilty of transporting marijuana and possessing marijuana for sale.

Pursuant to state law prohibiting double punishment for the same acts, A.R.S. § 13-1641, the trial court vacated the guilty verdict for possessing marijuana for sale and sentenced the defendant on the transporting marijuana charge to from five years to five years and one day in the state prison. Defendant appeals from his conviction and sentence.

### WERE DEFENDANT'S SPEEDY TRIAL RIGHTS VIOLATED?

The defendant contends that he was denied his rights to a speedy trial under Rule 8.2, Rules of Criminal Procedure, 17 A.R.S., and the Sixth Amendment to the United States Constitution.

Defendant was not in custody as a result of the second indictment and the applicable provision of Rule 8.2 reads as follows:

"c. *Defendants Released from Custody.* Every person released under Rule 7 shall be tried by the court having jurisdiction of the offense within 120 days from the date of his initial appearance before a magistrate on the complaint, indictment or information, or within 90 days from the date of his arraignment before the trial court, whichever is the greater." Rule 8.2(c), Rules of Criminal Procedure, as amended May 1975, effective 1 August 1975, 17 A.R.S.

Trial commenced within 120 days from the date of the new indictment. It is then apparent that as far as the time limits of the matter commenced by indictment on 18 November 1976, there is no violation of the speedy trial requirements of Rule 8.

Neither are we concerned with the provisions of paragraph (d) of Rule 8.2 which provides that a trial shall be commenced within 60 days after a reversal of judgment by an appellate court. There was no reversal of judgment by the appellate court and (d) of Rule 8.2 was not applicable.

█ The only delay we are concerned with and which the defendant urges as error was the 435 day lapse of time from the dismissal without prejudice to the filing of the new indictment on 18 November 1976.

The legislature, by statute, has given the State a right to appeal from a pretrial suppression order:

"§ 13-1712. *Appeal by state*

"An appeal may be taken by the state from:

\*     \*     \*     \*     \*     \*

"7. An order granting a motion to suppress the use of evidence. As amended Laws 1969, Ch. 133, § 11."

We have upheld the constitutionality of that statute. *State v. Lelevier,* 116 Ariz. 37, 567 P.2d 783 (1977).

At the time of the granting of the motion to dismiss, the State had an option of going to trial without the suppressed evidence or allowing the case to be dismissed and appealing the ruling. The State evidently felt that going to trial was unacceptable because of the probability that there would be insufficient evidence to convict. In dismissing the matter, the State faced a risk that the defendant, who was released from custody at the time of the dismissal, might not be available or that witnesses would be unavailable. The running of the speedy trial requirements of Rule 8.2 was not one of these risks because during this time the trial court was without jurisdiction to proceed. We therefore find no Rule 8 violation. *State v. Pogue,* 113 Ariz. 478, 557 P.2d 163 (1976).

But defendant contends that the dismissal by the State was to avoid the provisions of Rule 8 and therefore was in violation of Rule 16.5, as amended, Rules of Criminal Procedure, 17 A.R.S., which reads:

"Rule 16.5 *Dismissal of prosecution*

"a. *On Prosecutor's Motion.* The court, on motion of the prosecutor showing good cause therefor, may order that a prosecu-

tion be dismissed at any time upon finding that the purpose of the dismissal is not to avoid the provisions of Rule 8." We do not believe the matter was dismissed to avoid the provisions of Rule 8. The State dismissed because without the evidence ordered suppressed, the State could proceed no further. Had the motion to suppress been denied, we may assume that the State would have timely proceeded to trial. We find no violation of Rule 8.2.

Neither do we find a violation of the defendant's constitutional right to a speedy trial. In adopting a balancing test in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court identified four factors to be considered by courts in determining whether a particular defendant has been deprived of his constitutional right to a speedy trial:

1.  length of the delay;
2.  the reason for the delay;
3.  the defendant's assertion of his right; and
4.  prejudice to the defendant.

In the instant case, the total delay between defendant's first arrest and ultimate trial was less than two years. The chief delay attacked by the defendant was the delay occasioned by the State's appeal from the suppression order. The United States Supreme Court has recognized that:

> " * * * The right of a speedy trial is necessarily relative. It is consistent with delays and depends on circumstances. It secures rights to a defendant. It does not preclude the rights of public justice." *Beavers v. Haubert,* 198 U.S. 77, 87, 25 S.Ct. 573, 576, 49 L.Ed. 950, 954 (1905), quoted approvingly in *Barker v. Wingo,* supra, 407 U.S. at 522, 92 S.Ct. at 2188, 33 L.Ed.2d at 112.

■ The State's exercise of its right to appeal from an adverse evidentiary ruling must be considered a justifiable excuse for delay. While the defendant did object to the State's motion to dismiss, he made no further effort to assert his rights to a speedy trial. Also, there is no showing of prejudice resulting from the delay: the defendant was not incarcerated during the pendency of the State's appeal and, notwithstanding the defendant's "belief" that the State's witness, Armando Rodriguez, "was unable to accurately recall events critical to the defense" of entrapment, there is no evidence that his or any other witness's memory would have been better or testimony any different had the trial been held earlier. We find no prejudice to the defendant and no violation of the defendant's statutory or constitutional rights to a speedy trial.

We feel, however, that we must comment on the action of the Court of Appeals in holding that the dismissal of the action by the trial court made the appeal moot. Our statute gives the State the right to appeal from "an order granting a motion to suppress the use of evidence." A.R.S. § 13–1712(7).

■ When the State desires to appeal from an adverse ruling of the trial court on a motion to suppress, the State does not have the right to suspend the trial and the running of the speedy trial rule requirement while an appellate court rules on its appeal. Absent a stay granted by the appellate court in those rare instances where it is appropriate, the State may not leave the defendant in limbo or in custody while it pursues the right of appeal:

> "The second argument propounded by the appellant regarding the validity of § 13–1712 is that it is silent about whether the prosecution may be indefinitely continued while the state's appeal is pending. The simple answer to that is that the constitutional and statutory guarantees of a speedy trial would prevent any such indefinite postponement. The court followed the appropriate procedure in dismissing the case (in this instance without prejudice) when the state could not proceed to trial." *State v. Lelevier,* 116 Ariz. 37, 38–39, 567 P.2d 783, 784–85 (1977).

The State, in the instant case, had a choice; it could either dismiss the case and release the defendant and pursue its appeal with all the dangers this involved, or proceed to

trial without the suppressed evidence and with lessened expectations of conviction. To hold that the State, by dismissing the action with or without prejudice, rendered the appeal moot, would make the appeal right of A.R.S. § 13–1712(7) worthless. The appeal was not moot.

WAS THE WARRANTLESS SEARCH OF DEFENDANT'S MOTOR HOME VEHICLE BASED ON PROBABLE CAUSE AND JUSTIFIED BY EXIGENT CIRCUMSTANCES?

The defendant contends that the trial court erred in denying his motion to suppress evidence because the evidence was seized in a warrantless search which was neither based on probable cause nor justified by exigent circumstances. We do not agree.

In *State v. Sardo,* 112 Ariz. 509, 543 P.2d 1138 (1975), we indicated that the facts and circumstances as to whether probable cause exists may be viewed from the collective knowledge of all the law enforcement agents involved in the operation, and further, that

"Information can be viewed in light of the fact that an officer relied upon his past experiences to interpret the actions of persons he had under surveillance. See *United States v. See,* 505 F.2d 845 (9th Cir. 1954)." 112 Ariz. at 514, 543 P.2d at 1143.

After examining the facts and circumstances present in that case, we concluded that

"[w]hile no single event in this case could sustain a finding of probable cause * *, the totality of events made it more probable than not that the agents would find smuggled contraband in the motor home vehicle." 112 Ariz. at 515, 543 P.2d at 1144.

In the instant case, the area in which the surveillance took place was well known by law enforcement officers as a center of marijuana smuggling. *State v. Benge,* 110 Ariz. 473, 477, 520 P.2d 843, 847 (1974). The motor home fit the description of a vehicle which officers had been told was used in narcotics trafficking. It was observed being loaded, late at night, with several dark plastic garbage bags appearing to be full of "brick sized objects." One of the surveilling officers testified that he had seen similar garbage bags used in more than 100 prior marijuana case investigations and that such garbage bags are commonly used for transporting marijuana because they conceal the smell, are waterproof, and are capable of being packed in "uneven areas." After being loaded and driven to another location and parked for approximately one hour, the motor home was driven, at approximately 1:00 a. m., toward the California border.

We believe that the totality of the facts and circumstances, when viewed in light of the police officers' knowledge and past experience, would lead a person of reasonable caution to have probable cause to believe that the motor home contained contraband.

█ Defendant contends, however, that even if probable cause did exist, the search was unlawful because no warrant was obtained. When probable cause exists, a motor vehicle may be searched and contraband therein seized without a warrant if exigent circumstances are present. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *State v. Harrison,* 111 Ariz. 508, 533 P.2d 1143 (1975).

"* * * The apparent mobility of a motor vehicle presents a pressing need for a prompt search, i. e. an exigent circumstance." *State v. Sardo,* supra, 112 Ariz. at 513, 543 P.2d at 1142.

█ The defendant further contends, however, that despite the apparent mobility of the motor home, there was no real exigency justifying a warrantless search in the instant case because a warrant could have been sought during the two hours between the time the motor home was first observed being loaded and the time it was stopped near the California border, based on the same justification used to make the warrantless search. We agree with the United States Supreme Court that the failure to obtain a warrant at the earliest possible

moment does not necessarily make a subsequent warrantless search unreasonable:

"Respondent contends that * * * probable cause to search the car existed for some time prior to arrest and that, therefore, there were no exigent circumstances. Assuming that probable cause previously existed, we know of no case or principle that suggests that the right to search on probable cause and the reasonableness of seizing a car under exigent circumstances are foreclosed if a warrant was not obtained at the first practicable moment. * * * The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action." *Cardwell v. Lewis*, 417 U.S. 583, 595–96, 94 S.Ct. 2464, 2472, 41 L.Ed.2d 325, 338 (1974).

We do not believe the authorities had to stand idly by while the vehicle moved into another jurisdiction. The threat that a moving vehicle will leave the jurisdiction is a factor indicating exigency. Tracing the vehicle and searching it days or even hours later could permit instruments or fruits of crime to be removed from the vehicle or destroyed before the search. See *Chambers v. Maroney*, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419, 428, fn. 9 (1970).

Defendant further contends, however, that there was no immediate necessity for a warrantless search because the presence of "eight federal and local officers * * * at the scene of the stop, in several radio equipped vehicles, negate[d] any inference that a search warrant could not have been handily obtained."

Again, we find the United States Supreme Court's view on the subject dispositive:

"Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater.' But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." *Chambers v. Maroney*, supra, 399 U.S. at 51–52, 90 S.Ct. at 1981, 26 L.Ed.2d at 428 (1970). See also *State v. Benge*, supra.

We find that the police officers were justified in searching the motor home without first obtaining a warrant.

## DID THE DEFENDANT ESTABLISH ENTRAPMENT AS A MATTER OF LAW?

■ The defendant moved for a directed verdict based upon entrapment. The trial court denied the motion and instructed the jury that once the defense of entrapment had been raised, the burden was upon the State to disprove the existence of entrapment. On appeal, the defendant contends that the facts show entrapment as a matter of law, and that it was error to have denied his motion for directed verdict.

The informant who supplied the initial information leading to the defendant's arrest was Armando Rodriguez. Rodriguez had been arrested by Border Patrol Agents on 31 January 1975 and charged in federal court with violating drug importation laws. He agreed to supply authorities with information on other narcotics traffickers in exchange for his release from custody on his own recognizance pending his trial and a recommendation of leniency based on his cooperation with the DEA authorities.

Defendant's contention that the trial court erred in failing to rule that entrapment was established as a matter of law is based on his own testimony that the government's informant, Armando Rodriguez, arranged the transaction that resulted in his arrest and in effect supplied him with the marijuana. Defendant cites *State v.*

*Boccelli*, 105 Ariz. 495, 467 P.2d 740 (1970) and *State v. McKinney*, 108 Ariz. 436, 501 P.2d 378 (1972) wherein we held that entrapment is established where there is uncontradicted evidence that the illegal drug was supplied by the government or its agents.

Acco.ding to the defendant's testimony, it was Rodriguez who first approached him concerning a marijuana deal. Rodriguez then allegedly arranged with his connections in Mexico to have the marijuana delivered on credit to a hospital parking lot in Yuma, Arizona. Rodriguez had allegedly earlier contacted the defendant and given him descriptions and license numbers of the "load" cars that defendant was to pick up. Defendant claimed that it was this marijuana, "supplied" by Armando Rodriguez at a time when he was a government informant, that was discovered in the motor home driven by the defendant on 12 May 1975.

The defendant's testimony as to his "entrapment" did not go uncontradicted. In rebuttal, informant Rodriguez testified that several months before he became an informant for the government, the defendant expressed to him an interest in meeting his friends in Mexico for the purpose of organizing a way to bring marijuana into the States; that he and the defendant made a trip to Mexico during which he introduced the defendant to his friends; that the defendant later told him that he did not want to deal with his (Rodriguez') friends because of their youth and incompetence, but that he had met others through them who were better organized; that the defendant later introduced him to his bilingual Mexican contact named Chope and that the defendant told him that they were organizing themselves to bring loads of marijuana across the border. Rodriguez also testified that subsequent to his becoming an informer, his first contact with the defendant was made by the defendant who sought to enlist his services in his smuggling operations. Rodriguez testified that when he offered to bring in a buyer (a government undercover agent), the defendant began to mistrust him and thereafter dismissed him:

" *  *  *  Mr. Million questioned me regarding who my buyer was because Chope told his cousin that he wanted to work with me and my buyer. At this time Mr. Million asked me about him. I said, 'Yes, I have an old friend who is interested in buying.' And Mr. Million said he didn't need him. He didn't need any buyers at all. He was working just fine.

"Q During your stay with Mr. Million was there any lack of trust between you?

"A Yes, I think Mr. Million did mention that he was trying to make up his mind whether I could be trusted or not.

"Q Do you remember when he mentioned this?

"A Yes, sir, the day he brought up the fact that I was trying to move in on him by bringing a buyer in.

*      *      *      *      *      *

"Q Did Mr. Million offer you any employment during this period of time?

"A Well, during this period of time we were discussing what my role was to be; however, when Mr. Million found out that I had a buyer and I was not interested in working for him he asked me to leave; that he didn't need me and not to come back anymore, just to forget him.

*      *      *      *      *      *

"Q Approximately how much time before the—Mr. Million's arrest did you leave—were you kicked out?

"A I would say a minimum of two and a half weeks."

Rodriguez further testified that he had no information concerning the specific transaction for which the defendant was arrested.

In view of the conflicting evidence presented at trial, we cannot say that entrapment was established as a matter of law. Even assuming the defendant's version to be true, the facts in the instant case would be substantially similar to those in *State v. Cox*, 110 Ariz. 603, 522 P.2d 29 (1974), wherein we stated:

"The defendant's final contention is that he was entrapped into transporting the marijuana as a matter of law. He bases that contention on the 'fact' that the informant Whitney 'supplied' the marijuana, as in *State v. Boccelli*, 105 Ariz. 495, 467 P.2d 740 (1970) and *State v. McKinney*, 108 Ariz. 436, 501 P.2d 378 (1972). We do not agree.

"Entrapment as a matter of law is established where the defendant raises a substantial and reasonable defense of entrapment which makes it patently clear that he was entrapped, and where the State has done nothing to rebut the defense. *State v. Boccelli*, supra; *State v. McKinney*, supra. In both *Boccelli* and *McKinney* the contraband was supplied by government agents. The record in the instant case supports the contention of the State that the informant did not supply the contraband to the defendant. The informant did nothing more than arrange for a sale between predisposed buyers, *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), and a willing seller who had no connection with the Department of Public Safety. The jury was properly instructed on the entrapment defense, and it was not error for the court to have denied the defendant's motion for a directed verdict based upon entrapment as a matter of law." 110 Ariz. at 610, 522 P.2d at 36.

Judgment and sentence affirmed.

STRUCKMEYER, V. C. J., and HAYS and HOLOHAN, JJ., concur.

GORDON, Justice (concurring in part, dissenting in part):

Until this case it was consistently held that once an appeal was perfected the trial court lost jurisdiction in the case and could do nothing other than take care of matters "in furtherance of the appeal". *Application of Lopez*, 97 Ariz. 328, 400 P.2d 325 (1965); *State v. Rendel*, 18 Ariz.App. 201, 501 P.2d 42 (1972). Here the chronology of events was: (1) perfecting of appeal by the state after a disappointing ruling by the judge; (2) a state requested dismissal of the action by the trial court over defendant's objection. I consider dismissing the case after perfection of the appeal to be something more than "in furtherance of the appeal". This conduct has the effect of depriving the appellate court of the ability to consider the issues framed by the appeal and is, thus, inconsistent with the appellate court's powers.

A clear ramification of the majority's holding is the encouragement of issue-avoidance after an appeal has been perfected. In civil cases, the practice of permitting the trial court to dismiss claims for relief, whether asserted by complaints, counterclaims, crossclaims or third party complaints, would allow the trial court, on its own initiative or at the request of a party, to prune from the appeal any improper ruling.

It appears by this decision that we are making a special exception to the rule for criminal cases. Although this may be laudable in view of the legislative intent evidenced by § 13–1712 A.R.S., I believe this result should be reached by a change in the appellate rules specifically authorizing the trial court to take additional action after an appeal has been perfected in order to aid any appeal based on one of the circumstances listed in § 13–1712 A.R.S.

I would agree with the majority that it would have been proper for this court to entertain the state's appeal had the appeal/dismissal chronology been reversed, i. e., the state dismissed the action first and, thereafter, within the appropriate time, appealed the ruling of the trial court suppressing the evidence. Had this been the sequence of events, the fact that we may then have been entertaining a moot appeal is not as problematic for me as leaving the trial court with the ability to reshape issues on appeal by withdrawing certain questions from the appellate court.

In all other respects I concur with the holdings of the majority in this case.