664 P.2d 228

The STATE of Arizona, Petitioner,

v.

SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF PIMA, and the Honorable Michael J. Brown, Judge of the Superior Court, Respondent,

and

John Anthony LESSON, Real Party in Interest.

No. 2 CA–CIV 4674.

Court of Appeals of Arizona, Division 2.

Feb. 1, 1983.

Rehearing Denied March 15, 1983.

Review Denied May 24, 1983.

Stephen D. Neely, Pima County Atty. by Michael P. Pollard, Tucson, for petitioner.

James E. Sherman and Thomas R. Althaus, Tucson, for real party in interest.

## OPINION

BIRDSALL, Judge.

Mr. Lesson is the defendant in Cause No. CR–08145, a pending superior court prosecution for first-degree felony murder, two counts of first-degree burglary, and two other charges. The respondent judge granted his motion to suppress certain items seized at his residence on June 23, 1981, pursuant to a telephonic search warrant issued by another superior court judge. Although the suppression order is appealable, the state maintains the remedy is inadequate as dismissal would be necessary. Since the defendant's release from custody would follow, *State v. Million,* 120 Ariz. 10, 583 P.2d 897 (1978), and he has previously fled to Canada, the state's fear that he will again flee is not groundless. The reality of the situation justifies appellate intervention by special action.

The following evidence was presented at the suppression hearing. On June 23, 1981, two federal officers and three members of the Pima County sheriff's office entered the defendant's residence pursuant to two search warrants. The federal search warrant authorized a search of the premises for firearms and ammunition and the other warrant, issued by a Pima County Superior Court judge, authorized a search for stolen parts from vehicles. The only other refer-

ence to the state warrant appears in the information related to Judge Meehan in support of the telephonic search warrant. The validity of these search warrants is not challenged.

The three officers from the sheriff's department testified at the suppression hearing (Newburn, Youngling and Downing), along with one federal agent, VanHolst, and Sgt. Lawton, another member of the sheriff's office who had been summoned to the residence to identify certain items discovered during the search for firearms and ammunition.

During the search of the master bedroom of the Lesson residence, the federal agents were assisted by Officer Downing. Officer Downing testified that as agent VanHolst was conducting his search of a safe in the closet, Downing observed quite a bit of jewelry and a silver bar in the safe. VanHolst testified that the safe in the closet was "relatively small" and that as he was searching it he would take items out. He removed items from the safe and put them on the bed because he "could not see back in it." On cross-examination he testified that he did not purposely leave any of the items out for the sheriff's officers to check out and had not been instructed to do so. According to him, the shelves in the safe were stationary and were not spaced very far apart and therefore he pulled the items out and set them on the bed in order to search for firearms and ammunition which might be in the back of the safe. Weapons and ammunition described in the federal warrant were found in that bedroom.

Sergeant Newburn testified that Officer Downing advised him that there was some jewelry in the master bedroom. Newburn, a member of the burglary strike force of the sheriff's office, was the supervising officer. He and other members of the strike force had been involved in the investigation of Lesson and were aware of the information acquired in the investigation. Newburn went in and looked at the jewelry. He then summoned Sgt. Lawton because he had case reports for some of the property the officers believed would match up with some of the property observed on the bed. On questioning by the court, Newburn testified that the federal agents were aware of the fact that Lesson was a suspect in a lot of burglaries. When asked what kinds of property were lying on the bed, he responded:

"There was [sic] some coins, there was a silver bar, there was a lot of jewelry, some watches, there were some papers, there was [sic] some filing cabinets, the small files like, I think there were a couple of buses [sic] that had papers and stuff in them, too."

Officer Youngling testified to information he had previously received from Yanko Milenkevich as to houses that he and Lesson had burglarized and that most of the items stolen in the burglaries had been taken to Lesson's residence. This information had been passed on to the other members of the strike force and they obtained case reports matching the information. Lawton, who had been summoned to the residence, went through his case reports as to burglarized houses and checked off items lying on the bed against the reports. Youngling, who had assisted in the search of a tool shed, had also observed two Remline tool boxes which he suspected had been stolen. When Lawton arrived on the scene with his case reports, the tool boxes were also identified as having been stolen. After Youngling viewed the items on the bed which had been identified by Lawton as stolen, he applied for a telephonic search warrant.

Youngling's affidavit in support of the search warrant recited the circumstances of the information gleaned from the reliable informant, Milenkevich, a long list of items, several hundred, stolen from the burglarized premises, and his having seen specific items of stolen property at the Lesson residence: Mexican pesos, silver dollars, a gold cameo brooch, a gold Illinois Railroad watch, and two Remline tool boxes. The affidavit recited that these items were in plain view on the premises, and that he and his sergeant were on the premises to assist in the execution of the search warrant for firearms and stolen parts from vehicles.

Based on Youngling's affidavit, the issuing magistrate found probable cause and issued the search warrant. The subsequent search resulted in the seizure of money bags and a silver bar. The respondent judge ordered that the evidence seized pursuant to the telephonic search warrant be suppressed.

We do not agree that the police actions here violated Lesson's Fourth Amendment right against unreasonable searches and seizures. There is no question that the officers, both federal and state, were lawfully on the premises pursuant to search warrants authorizing a search for stolen firearms and ammunition and parts of vehicles. The United States Supreme Court has recognized the possibility that the "plain view" doctrine might expand the scope of a search pursuant to a warrant in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), reh'g denied, 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971):

> "An example of the applicability of the 'plain view' doctrine is the situation in which the police have a warrant to search a given area for specified objects, and in the course of the search come across some other article of incriminating character." 403 U.S. at 465, 91 S.Ct. at 2037, 30 L.Ed.2d at 582.

■ The *Coolidge* court set out several requisites for the seizure of evidence in plain view. First, the police are required to be legitimately in a position to obtain the view in order for the seizure to be permissible. The second requirement of *Coolidge* is that the articles are, in fact, in "plain view." Since the police are empowered to look anywhere in the house where the articles to be seized may be located, anywhere they are empowered to look is also a place where they are legitimately present and anything seen in those places, no matter how concealed from ordinary visual scrutiny, is within their plain view. *See State v. Shinault,* 120 Ariz. 213, 584 P.2d 1204 (App. 1978), where this court held that once it was obvious the items listed in the warrant could not be found in a box, there was no justification to search the contents of the box. The final two requirements as set out

in *Coolidge* are the crucial ones for seizure of articles not mentioned in the search warrant: (1) the incriminating nature of the articles must be readily apparent, and (2) the discovery of the articles must have been inadvertent.

The first two requirements of *Coolidge* were satisfied. The police were on the premises legally and could search anywhere in the house where the articles named in the warrant might be located. Thus their search of the closet, drawers, and the safe was justified.

■ The extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; "the 'plain view' doctrine may not be used to make a general exploratory search from one object to another until something incriminating at last emerges." *Coolidge, supra,* 403 U.S. at 466, 91 S.Ct. at 2038, 29 L.Ed.2d at 583. Mere suspicion is not enough for seizure; there must be some ". . . nexus . . . between the item to be seized and criminal behavior." *Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). We agree with the rationale of *United States v. Truitt,* 521 F.2d 1174 (6th Cir.1975) that the standard is the same as that for probable cause, and that the issue is not whether the object is contraband but whether its discovery under the circumstances would warrant a man of reasonable caution in believing that an offense has been committed or is in the process of being committed, and that the object is incriminating to the accused. Compare *United States v. Gray,* 484 F.2d 352 (6th Cir.1973), cert. denied, 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974). Under the circumstances here, where the officers knew that Lesson had been involved in an extensive series of burglaries and that the stolen property was brought to his residence, where Sgt. Newburn recalled some of the items placed on the bed, and the stolen property described in the search warrant had been discovered, a man of reasonable caution would believe that the discovered objects were evidence of crime.

■ Finally, we believe the inadvertence element of plain view was satisfied. It is undisputed that the police did not have sufficient knowledge to rise to the level of probable cause to obtain a warrant for the discovered objects. We agree with the view adopted by some courts that the inadvertence rule means that although the police may have had some expectation that they would discover the objects in plain view, their knowledge did not rise to the level of probable cause to obtain a warrant for these items. *See e.g., United States v. Sanders,* 631 F.2d 1309 (8th Cir.1980), cert. denied, 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981); *State v. Pepe,* 176 Conn. 75, 405 A.2d 51 (1978); *Commonwealth v. Millard,* 273 Pa.Super.Ct. 523, 417 A.2d 1171 (1979); *United States v. Hillstrom,* 533 F.2d 209 (5th Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977); *United States v. Winston,* 373 F.Supp. 1005 (E.D.Mich.1974), aff'd, 516 F.2d 902 (6th Cir.1975); *Valerio v. State,* 542 P.2d 875 (Wyo.1975).

■ The respondent judge apparently was much concerned about the fact that the federal agents left certain items on the bed because "the sheriff's office was interested in looking at it." However, Officer Downing had already observed the items when they were removed from the safe in order to afford the federal agents an opportunity to search the entire safe. The inadvertence of the discovery was not obliterated by leaving the articles on the bed.

■ One final comment is necessary. The respondent judge specifically found that Officer Lawton had no right to be on the premises for the purported purpose of providing security and unlawfully "searched" the property lying on the bed. There is no evidentiary basis for this finding. Officer Lawton was not on the premises for the purpose of providing security but rather to identify specific items of contraband. In *State v. Scigliano,* 120 Ariz. 6, 583 P.2d 893 (1978), our supreme court upheld the trial court's admission of evidence against the defendant's constitutional challenge. In *Scigliano,* the police officers executing a search warrant brought one of the informants with them for the search, and she pointed out to the officers other items not specified in the warrant. In *People v. Superior Court of Marin County,* 25 Cal.3d 67, 598 P.2d 877, 157 Cal.Rptr. 716 (1979), the Supreme Court of California held that victims of a burglary may accompany the police in execution of a valid search warrant in order to identify stolen property of theirs which they had reason to believe would be found on the suspect's premises. *See also People v. Superior Court of Santa Clara County,* 104 Cal.App.3d 1001, 163 Cal. Rptr. 906 (1980) (in a prosecution for theft of trade secrets, admission of evidence seized pursuant to a search warrant was upheld where the officers executing the warrant utilized experts to search and identify the items described in the warrant.) *See also State v. Woratzeck,* 130 Ariz. 499, 637 P.2d 301 (1981).

Nothing in the record indicates that the federal officers originally secured a search warrant as a pretext to conduct a general exploratory search of Lesson's residence. Nor is there any evidence of vindictiveness or other improper motivation on the part of the assisting officers. The only practical way other stolen property in plain sight during the search could be identified was to seek the assistance of a person able to identify the property in question. That person was Officer Lawton.

The order suppressing the evidence seized pursuant to the June 23, 1982, telephonic search warrant is vacated.

HOWARD, C.J., and HATHAWAY, J., concur.