[Criminal No. 812. Filed April 1, 1935.]

[43 Pac. (2d) 210.]

JEFF VILIBORGHI, Appellant, v. STATE OF ARIZONA, Respondent.

Messrs. Dougherty & Dougherty and Mr. Roy L. Herndon, for Appellant.

Mr. Arthur T. La Prade, Attorney General, Mr. John Francis Connor, Assistant Attorney General, and Mr. John L. Sullivan, Attorney General, and Mr. Elmer C. Coker, Assistant Attorney General, for the State.

LOCKWOOD, C. J.—Jeff Viliborghi, hereinafter called defendant, was informed against by the county attorney of Maricopa county for the crime of murder.

He was tried before a jury, which returned a verdict of manslaughter, and after judgment on the verdict had been returned, this appeal was taken.

 The evidence introduced by the state in its case in chief tended to show the following facts: Deceased, one Alfredo Carrion, a Mexican boy about sixteen years old, and two companions of about the same age had attended a moving picture show the evening of the homicide. On their way home they decided to run a race, and did so, finishing the race in front of a store owned by defendant. While standing there talking together, a shot was fired from the interior of the store and deceased fell to the ground. His companions ran home and informed deceased's parents and notified the police, thereafter returning to the store, where they found the body of deceased, the cause of death being a gunshot wound in the brain. Defendant was arrested, and while he was under arrest admitted to various witnesses that he fired the shot which killed the deceased. This, of course, under the statute was sufficient to make a *prima facie* case of second degree murder, and put upon defendant the burden of proving circumstances of mitigation, or that justified or excused the killing. Section 5050, Rev. Code 1928.

Defendant claimed the killing to be justifiable under subdivisions 1 and 2 of section 4590, Revised Code 1928, which section reads in part as follows:

"4590. Justifiable homicide; bare fear as justification. Homicide is also justifiable when committed by any person: 1. When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; or, 2. when committed in defense of habitation, or property, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or manifestly intends and endeavors, in a violent, riotous, or tumultuous manner, to enter the habitation of an-

other for the purpose of offering violence to any person therein; . . .

"A bare fear of the commission of any of the offenses mentioned in subdivisions two and three hereof, is not sufficient to justify a homicide. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone."

In order to sustain this defense he offered evidence which tended to show the following facts:

Defendant had been engaged in the grocery business at the location where the killing occurred since 1925. The premises occupied by him as a store were also used for his residence, and he lived there alone. Three times between 1925 and the date of the killing his premises had been burglarized, or an attempt at burglary made, and on one occasion some unknown person had attempted to shoot him while he was in the building. The night of the killing defendant closed his store and retired about 10 P. M., but some time shortly thereafter he was awakened by hearing a noise in the front part of the building. Believing that someone was about to again rob the premises, he was afraid to turn on any light or expose himself before the windows. He arose from his bed, secured a revolver and crept into the store part of the building to determine what the situation was and, if it could be done safely, to go out through the front door to call for help. He continued to hear various noises around the building, and as he progressed toward the front he saw a human hand reaching in the front window and apparently trying to unhook the fastenings thereof. Believing that burglars were trying to break into the building, and that his life and property were in danger, he fired his revolver through the window and immediately heard the footfalls of persons running away. He went back

to his bedroom, partially dressed, and the noises having ceased, went through the front door and turned on the electric light and saw a body lying on the sidewalk. Beside it he saw a jar of preserves and a bottle of pickles which had evidently been taken from a shelf adjacent to the broken window through which he saw the hand entering. On examining the body he discovered it was that of a sixteen year old boy. He had known the boy before but had had no previous difficulties with him or any of his family. He thereupon notified the police and was arrested and placed in the city jail. He was visited shortly thereafter by representatives of the county attorney's office who, without advising defendant to secure counsel or warning him against incriminating himself, questioned him in regard to the matter. The next day he was visited by his counsel and was informed that he was not obliged to answer any questions, and that if called upon to do so he might refuse and ask to be represented by counsel. Shortly thereafter, and without his counsel being advised thereof, he was taken to his store building and there was further interrogated and photographs were taken of the building, both interior and exterior, one of which shows defendant in the position in which he had claimed he was when he fired the fatal shot. He claimed at the trial that he had protested against all of this last proceeding, but was compelled to acquiesce therein by the officers.

He also attempted to show that the locality where his store was situated had a bad reputation so far as the honesty and general character of its residents was concerned, and that he had a short time before the killing been informed by a friend that it was likely another attempt would be made to burglarize his place of business. The court, however, refused to admit this last-mentioned testimony.

Defendant also offered evidence of his previous good character, and when the county attorney cross-examined these character witnesses he was permitted by the court to question them as to whether these witnesses had known of certain assaults made by defendant upon children who had attempted to steal various objects from his store at different times. All of the witnesses denied having heard of such incidents, and the county attorney made no effort to substantiate his inference that they had occurred by any evidence. This was the substance of the evidence upon which the jury returned the verdict of manslaughter.

There are some twelve assignments of error properly stated under nine legal propositions, which we will consider in the order that seems best to us.

Assignment number twelve is as to the sufficiency of the evidence to sustain the verdict. It is undisputed that defendant fired the shot which killed deceased, and there was no evidence offered on behalf of the state which would show that such killing was justifiable or excusable, or that the grade of the killing could not exceed manslaughter. Such being the case, the burden was upon the defendant to raise a reasonable doubt in the minds of the jury as to whether he was justified or excusable in the killing, or as to whether it was only manslaughter. Section 5050, *supra*. Defendant attempted to meet this burden by showing that he fired the fatal shot under a reasonable belief that his life was in danger, and that the deceased was engaged in the commission of a felony, to wit, a burglary of defendant's premises. Whether or not the evidence raised this reasonable doubt was peculiarly a question for the jury, and we cannot say, as a matter of law, that it was not justified in holding that the circumstances, although perhaps believed by the defendant to indicate that his

life and property were in danger, were not such as to justify a reasonable man in this belief. The assignment that the evidence was insufficient to support the verdict is not well taken.

■ Nor do we think there is merit in the eleventh assignment of error, to the effect that the court erred in giving instructions to the jury upon murder in the first and second degrees, and in submitting to it verdicts covering these offenses. It is of course the law that the court should not instruct upon any degree of an offense which is not reasonably sustained by some phase of the evidence. We need not, however, decide whether the evidence would have sustained a verdict of murder in either the first or second degree. The jury by its verdict of manslaughter acquitted the defendant of the more serious crimes, and even if there was error in the giving of the instructions it was not prejudicial.

■ The first assignment of error is that the court should have granted defendant's request for an interpreter. It is urged that defendant is an ignorant Italian, incapable of speaking or understanding the English language correctly, and that he could not properly present his testimony without the aid of an interpreter. In the case of *Escobar* v. *State,* 30 Ariz. 159, 245 Pac. 356, we have discussed a somewhat similar situation and have held, in substance, that it is within the sound discretion of the court as to whether an interpreter is provided for the benefit of a defendant, and that the test of an abuse of discretion is whether or not such failure has hampered the defendant in any manner in presenting his case fairly to the jury. We have examined the reporter's transcript and are of the opinion it shows affirmatively that the defendant both spoke and understood the English language to such an extent that he was in no way hampered in giving his testimony before

the jury. There was therefore no error in denying him the services of an interpreter.

The second assignment of error is that the court permitted the introduction of certain photographs of the defendant taken at the *locus in quo* after the commission of the crime and over his protest. We have examined the transcript on this point also and it appears therefrom that there was a dispute as to whether any protests were made by the defendant at the time, he saying that there were, and the officers who were present insisting that he not only did not protest, but voluntarily assisted in the taking of the photographs. It was within the discretion of the trial court to determine under these circumstances whether they were admissible, and we cannot say from the record this discretion was abused. The same rule applies to assignment number three, which refers to the introduction of certain alleged fragmentary and incomplete statements of the defendant. Neither of these assignments is well taken.

The fourth assignment is that the court erred in excluding evidence of the dangerous and lawless reputation of the vicinity of the *locus in quo;* of the communication to defendant of threats to burglarize his store, and of previous burglaries and attempted burglaries of the store, all of this evidence being offered as bearing upon the reasonableness of the defendant's apprehension of danger under the circumstances as described by him. So far as the previous burglaries are concerned, it appears from the transcript that defendant was permitted to testify in regard to them quite fully, but he was not allowed to show the dangerous and lawless reputation of the vicinity, or that he had been told recent threats to burglarize his store had been made. We are of the opinion that this was error on the part of the trial court. Certainly a man who lived in a lo-

cality which was notoriously lawless, and who had been told that his premises were about to be burglarized, would have far more reason to apprehend that his property and life were in danger than one whose place of business was in a peaceful and law-abiding community where no previous burglaries or threats of burglaries had ever been made. After all, under the circumstances of this case, it is very clear that the vital issue was, did defendant, as a reasonable man, have ground to believe that in order to protect his life or person from great bodily injury, or his premises from the commission of a felony by intrusion thereon, it was necessary to resort to the use of firearms? Anything which would affect the belief of a reasonable man in regard to these matters, and which was known to the defendant, would be highly material in aiding the jury to place themselves in his position and, seeing what he saw and knowing what he knew at the time, decide whether he acted as a reasonable man. The exclusion of the evidence was therefore erroneous and we think prejudicial.

We next consider assignment number five, to the effect that the county attorney was allowed to cross-examine witnesses who testified to defendant's good reputation by asking them whether they had any knowledge of certain specific acts of misconduct on the part of the defendant, when he made no effort to show that such alleged misconduct actually existed. It is true that several of the textwriters state that where a witness has testified as to a defendant's general good reputation he may be asked on cross-examination whether the witness has ever heard that defendant has been accused of doing acts wholly inconsistent with the reputation which the witness has attributed to him, and there are some cases which specifically adopt this rule. *People* v. *Elliott,* 163 N. Y. 11, 57 N. E. 103; *McDonel* v.

*State,* 90 Ind. 320. We think, however, that this rule is not in the interest of justice. When counsel in cross-examination asks a witness if he has not heard that defendant has been guilty of some specific and particularly atrocious conduct, even though the witness may answer in the negative, the average juror is extremely apt to assume from the mere fact the question has been asked that rumors at least to that effect are afloat, and even perhaps that those rumors are true. If the same question is asked of several witnesses this impression is apt to be strengthened. Unscrupulous prosecutors, and we regret to state there are such, may thus ruin the reputation of a defendant before a jury by asking questions which they know are absolutely unfounded in fact. Even the cases which hold such questions are allowed do so on the ground that they are permitted only to test the accuracy and candor of the witness. We think the same result may be reached without danger of prejudicing the jury, by limiting the cross-examination for this purpose to questions as to the source from which the witness has obtained his knowledge of the reputation of the defendant, and, when he states those sources, permitting questions as to what he has heard therefrom regarding such reputation. If, as a matter of fact, the cross-examiner has reason to believe that there have been rumors derogatory to the reputation of defendant in circulation in certain quarters, he may be permitted to question the witness as to whether he had heard anything regarding the reputation of the defendant from such sources, and if so what, but without any reference in the question to details of the particular rumor. We hold, therefore, that in Arizona in the cross-examination of a witness who testifies to the good reputation of a party, the questions must not be in such form as to imply specific acts of misconduct of the

party, but should be confined to the source of his knowledge of the reputation and what he has heard from such sources.

The seventh, eighth, ninth and tenth assignments of error discuss certain instructions given by the court, and we consider them together. As we have said, the vital issue was whether the defendant was justified in firing the fatal shot. In order for the jury to determine this it was necessary that the court should instruct them under what circumstances the law considers a homicide justifiable or excusable, and it is contended by defendant that the instructions objected to necessarily gave the jury an entirely wrong understanding of the law. It is of course true that instructions must be considered as a whole, and that an assignment of error predicated on isolated paragraphs or portions thereof, even though they may not of themselves completely state the law, is not necessarily well taken. We have laid down the test to be applied in the case of *Macias* v. *State,* 36 Ariz. 140, 283 Pac. 711, 716:

"It is only when the instructions taken as a whole are such that it is reasonable to suppose the jury would be misled thereby that a case should be reversed for error therein. We think as good a test as any of whether specific sentences or phrases of the instructions contain reversible error is as follows: If any instruction directly contradicts the true rule of law so that the jury would be misled thereby on a material point, it is, of course, fatal; if, however, it is merely incomplete in itself, but when taken together with proper qualifications made in some other portion of the instructions it correctly states the law, it is not reversible error, unless it is so ambiguously worded that a reasonable man, taking the instructions as a whole, would be misled thereby. . . . "

And we apply this test in our discussion of the instructions in this case.

 The defendant asked for the following instruction as to the law of justifiable homicide, which was given:

"You are instructed, gentlemen, that any citizen of this state has a right to defend his habitation, his home, against any unlawful or violent intrusion by another, without his consent, for a felonious purpose, and his right to defend his home is governed by the same rule which governs a man's right to defend his person. Now, if at the time the defendant Viliborghi shot and killed the deceased, the latter was attempting to, or the defendant had reasonable ground to believe that the deceased was attempting to, make an unlawful and forcible intrusion upon the habitation of the defendant against the will of the defendant, and that the defendant believed at the time that it was necessary for the protection of his home or his person against an unlawful and violent intrusion by the deceased, and you further find that the belief and fear on the part of the defendant was reasonable, viewing the same from the standpoint of a reasonable man at the time, then the defendant had a right under our law to protect his person or his home, even to the extent of taking the life of the deceased. And if you so find from the evidence in this case, you will find the defendant not guilty, or, if after considering all the evidence in this case, you have a reasonable doubt on this question, you will give the defendant the benefit of that doubt and render a verdict of not guilty."

This we think is a correct general statement of the law as applicable to the evidence in this case, and if no further instructions on the subject of justifiable homicide had been given, the jury could not have been misled. The court, however, in addition thereto gave the following instructions at the request of the state:

"Gentlemen, if you believe from the evidence in this case beyond a reasonable doubt that the deceased, together with others, was passing the store or

standing in front of the store of the defendant, and did not attempt to burglarize defendant's store, then I charge you that the defendant was not justified in taking the life of the deceased, and in that event he would be guilty of either murder or manslaughter—that is, if you believe from the evidence beyond a reasonable doubt that the defendant fired the shot which resulted in the death of the deceased.''

"I instruct you, gentlemen of the jury, that the right to kill to protect one's habitation, or to prevent the commission of a felony, is based upon the law of necessity or apparent necessity; the right is limited to prevention and does not extend to punishment for an act already committed.''

"I instruct you in this regard that if you find from the evidence beyond a reasonable doubt that the defendant shot the deceased for the purpose of punishment and not to prevent the commission of a felony, then I instruct you that he was not justified in shooting the deceased, unless you further find from the evidence that defendant was in actual or apparent danger of losing his life, or sustaining great bodily injury.''

"I instruct you that the owner may resist an entry into his store or house but he has no right to kill unless it be necessary, or apparently necessary, to prevent a felonious stealing or destruction of his property, or to defend himself against loss of life, or great bodily harm, and if you find from the evidence in this case beyond a reasonable doubt that defendant did not shoot the deceased until after the entry or taking of the merchandise in question, if you find that deceased did enter and take the merchandise of defendant, then I instruct you that the defendant would not be justified in taking the life of the deceased, except to defend his own life, or save himself from great bodily injury.''

"You are instructed, gentlemen of the jury, that the law does not give one the right to take the life of another merely to prevent the theft of property and in this respect, I charge you that if you believe from the evidence beyond a reasonable doubt that this defendant shot and killed the deceased merely to prevent the theft or loss of the canned goods,

even though you find that the deceased was in the act of stealing the said canned goods, but if the defendant' had no reasonable cause to believe that his life was in imminent danger, then I instruct you that you should return a verdict of guilty.''

On comparing these instructions with the one given at the request of the defendant, it is obvious that they do not agree as to the law, and cannot in any reasonable manner be reconciled.

It was the contention of defendant, sustained by evidence offered in his behalf, that the deceased was, at the time the fatal shot was fired, actually engaged in a first degree burglary, with the intent to commit petit larceny. Section 4746, Rev. Code 1928. Petit larceny is the stealing of any goods under the value of $50, unless they belong to certain specified classes, regardless of value. Section 4757, Rev. Code 1928. This offense of itself is merely a misdemeanor, and the killing of a thief who is engaged merely in a misdemeanor is not justifiable. It may be urged that since under our statute the burglary is completed as soon as the felonious entry is made, that the actual taking of property as a result of and immediately after the entry is not burglary but merely petit larceny, and therefore the owner of the premises can only resist such taking in the manner allowed for the prevention of a misdemeanor. We think this is a most unreasonable limitation of the law of justifiable homicide. If this be the law, all a burglar needs to do is to complete his entry, and he may then with impunity continue his burglarious purpose without fear of being shot by the justly incensed home owner, so long as he tells the latter that he has no intention of taking more than $50 worth of property. We cannot conceive such to be the law, and hold that so far as the question of justifiable homicide is concerned, when goods

are stolen during the commission of a burglary, the entire act from beginning to end is a felony, and anyone who may kill the perpetrator before he has fully completed his purpose is to be tried by the rules applying to homicides committed to prevent felonies and not those which govern misdemeanors. It therefore follows that the owner of the premises burglarized ' may, at any stage of a burglary, kill the burglar if it be reasonably necessary to prevent the final completion of his felonious purpose, regardless at what stage of the crime the shooting occurs. He may even after the burglary has been completed and the burglar is withdrawing from the scene of his crime, if the latter attempts to resist or flee from arrest, use such force as is reasonably necessary for the apprehension of the offender, even to the taking of life. Section 4590, Rev. Code 1928. And in all of such cases the question of the necessity of the killing depends upon the reasonable apprehension and belief of the defendant, and not whether such apprehension and belief was justified by the facts as they actually existed. With these tests it clearly appears that the instructions complained of were erroneous in several respects.

The first one states positively that, regardless of what the circumstances would lead the defendant, as a reasonable man, to believe, if as a matter of fact the deceased was not actually engaged in an attempt to burglarize the defendant's store, the latter would be guilty of either murder or manslaughter in killing him. It omits entirely the test of reasonable grounds for belief, and directs the jury to return their verdict on the facts as they actually existed, and not as they appeared to the reasonable apprehension of the defendant.

The second instruction is correct, for under no circumstance may one person shoot another as a punishment for a crime which has been committed.

The third instruction is somewhat ambiguous in that it might be construed to mean that, after the entry had been completed, even though the burglary is still in progress, the owner of the premises may not kill to prevent the completion of the attempted crime. This, as we have said, is not the law. This instruction alone, however, in view of the general instructions, would probably not be reversible error, for the ambiguity is hardly of such a serious nature that, taking the instructions as a whole, it would mislead the jury.

The fourth instruction, however, is fatally erroneous. It states flatly that if the defendant killed the deceased to prevent the loss of the canned goods which are referred to in the evidence, even though the deceased was in the act of stealing them, he would be guilty of manslaughter. As we have stated, had the stealing been a simple misdemeanor, the instruction would have been correct; but the whole evidence shows beyond doubt that if the deceased did steal the canned goods referred to, it must have been done in the perpetration of a burglary, and the stealing was therefore part of a felony and the defendant was justified in killing the deceased if it was reasonably necessary to prevent its completion. In no possible way can this instruction be reconciled with the law, and it is obvious that it, considered with the evidence which appears in the record, was in the highest degree prejudicial, and could not be cured by a reference to the general instructions.

Because of the various errors which we have discussed, we are of the opinion that the defendant did not have that fair and impartial trial guaranteed him by the law, and the judgment of the superior court is therefore reversed and the case remanded for a new trial.

McALISTER and ROSS, JJ., concur.