611 P.2d 551

**The STATE of Arizona, Appellee,**

v.

**Neil Richard La MOUNTAIN, Appellant.**

**No. 4895.**

Supreme Court of Arizona,
In Banc.

April 29, 1980.
Rehearing Denied May 28, 1980.

548

Robert K. Corbin, Atty. Gen., by William J. Schafer III and Barbara A. Jarrett, Asst. Attys. Gen., Phoenix, for appellee.

Ross P. Lee, Maricopa County Public Defender by Edward C. Voss, Deputy Public Defender, Phoenix, for appellant.

CAMERON, Justice.

This is an appeal from jury verdicts and judgments of guilt of the crimes of first degree rape, A.R.S. §§ 13–611(A), –614(A); lewd and lascivious acts, § 13–652; and attempted lewd and lascivious acts, §§ 13–108, –109, –110 and 13–652.[1] Defendant was sentenced to not less than thirty-five nor more than forty years for the rape; four to five years for the crime of lewd and lascivious acts; and one to two and one-half years for the crime of attempted lewd and lascivious acts, all to run concurrently. We take jurisdiction pursuant to Rule 47(e)(5), Rules of the Supreme Court, 17A A.R.S.

We must answer four questions on appeal:

1. Was it error to allow testimony of a small folding knife found in the pocket of the defendant when the knife could not be produced at the time of the trial?
2. Was it error to introduce evidence of prior bad acts?
3. Was the identification of defendant as to his prior bad acts tainted by hypnosis?
4. Was the sentence excessive?

The facts necessary for a determination of this matter on appeal are as follows. At approximately 12:15 a.m. on the morning of 8 November 1977, the victim drove to a

1. Title 13 citations in this opinion are to the Arizona Criminal Code as it existed prior to its extensive revision effective 1 October 1978.

laundromat at 1424 North 32nd Street in Phoenix, Arizona, to do her laundry. While she was there, the defendant entered and walked to the back of the laundromat and looked inside the small rest room. He then walked back to the front of the laundromat and stood there looking around. The victim asked him if he had lost anything, and he said "no," and that he was waiting for a friend. He then left. A short time later he returned. While the victim was sorting her laundry, the defendant lunged at her. She screamed and started toward the door. Defendant grabbed her arm, put his hand over her mouth and told her that all he wanted was her panties. He forced her to the back of the laundromat, pushed her through the door of the rest room and against the wall. The victim started to scream again, and the defendant again placed his hand over her mouth and told her to be quiet or he would punch her. He then reiterated his demand that she give him her panties, saying that's all he wanted. She offered to give him a pair of panties out of her laundry, but defendant indicated he wanted "fresh panties." The victim again screamed, and defendant again put his hand over her mouth. He told her he was going to punch her, made a motion toward his pocket, and said, "I have something I can really hurt you with. I can hurt you permanently." The victim could not see the bulge of a gun in his pocket, so she thought he might be referring to a concealed knife or possibly acid. She indicated she would cooperate and give him her panties. She then took off her boots and jeans and unsnapped her body stocking. Defendant pulled her panties off her. He placed them up to his nose and started smelling them. The victim started to get dressed again, and the defendant told her to stop. He turned her around, shoved her into the corner, and placed his tongue in her anal area. He then turned her back around and tried to stick his erect penis in her mouth. She refused, but he did touch her on the lips, face and nose. Defendant then forced her to the floor, pulled down his pants, and proceeded to have intercourse.

Meanwhile, the police had been alerted by a person who had come into the laundromat and had heard the victim's screams. The police arrived shortly after being called. They testified they had heard the victim's screams and prepared to kick the door open, when it was opened and the victim came running out, naked from the waist down. Defendant was standing on the edge of the toilet trying to get through a small window. The officers found a pair of green and white women's panties in his pocket. These panties did not belong to the victim. The officers also found a small pocket knife in the defendant's pocket. The defendant was wearing ladies' panties at the time of his arrest.

During trial, another woman testified that over a year before the offense in question, she had been grabbed in the same laundromat by a person fitting the defendant's description. As in the case in question, the assailant asked for her panties and told her that was all he wanted, and he would not hurt her. This witness was unable to identify the defendant in a photographic lineup. After two sessions of hypnosis, she selected the defendant's picture from the photographic lineup and later made an in-court identification of the defendant. Two other people, who had chased the defendant at this earlier incident and detained him for a short time after he had attempted to assault the witness, were able to pick defendant's picture out of the photographic lineup, one after having been hypnotized. All these people identified the defendant in court.

After a mistrial, the defendant was retried, convicted, adjudged guilty, and sentenced from which he brings this appeal.

## EVIDENCE OF THE KNIFE

Prior to trial, a motion in limine was made to suppress any evidence concerning the knife. The evidence indicated the knife had been taken from the defendant, but had been lost by the authorities and could not be produced for trial.

It was apparent from her testimony that the victim felt her life was in danger and

the defendant was going to harm her. She testified that in the course of the rape, the defendant had motioned toward his pocket and told her he had something on him that would really hurt her and that he would use it. The victim testified that she felt defendant had a knife on his person. The trial court denied the defendant's motion and held that evidence regarding the knife was admissible because it shed light on the defendant's state of mind.

Rule 402 of the Arizona Rules of Evidence, 17A A.R.S., provides that all relevant evidence is admissible at trial:

"Evidence is relevant if it has any basis in reason to prove a material fact in issue or if it tends to cast light on the crime charged." *State v. Moss*, 119 Ariz. 4, 5, 579 P.2d 42, 43 (1978).

First degree rape as defined in A.R.S. § 13–611(A) is an act of sexual intercourse accomplished with a female, not the wife of the perpetrator, either through force or violence, or fear of great bodily harm, with the apparent ability to do such harm. The presence of the knife was relevant to the victim's fear of the defendant. The knife had a bearing on the factual issue and was material. *State v. Flynn*, 109 Ariz. 545, 514 P.2d 466 (1973).

The motion in limine was properly denied. The fact that the knife was unavailable for presentation to the jury did not prevent testimony concerning the existence of the knife. *State v. Soloman*, 125 Ariz. 18, 607 P.2d 1 (1980).

### EVIDENCE OF PRIOR BAD ACTS

■ Rule 404(b), Arizona Rules of Evidence, 17A A.R.S., provides as follows:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character "of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

Evidence of prior acts of sexual misconduct is generally inadmissible in a prosecution

for a sex offense except where it shows a common scheme or plan. *State v. Williams*, 111 Ariz. 511, 533 P.2d 1146 (1975); *State v. McFarlin*, 110 Ariz. 225, 517 P.2d 87 (1973).

■ We believe that the evidence in this case showed a common scheme or plan. While the events are not near in time, being fifteen months apart, we believe that the other similarities make the evidence admissible. *State v. Finley*, 108 Ariz. 420, 501 P.2d 4 (1972). The crimes were committed in the same laundromat, occurred at night, and the accused commenced the assaults by demanding the panties of his victims. *Williams*, supra. We find no error.

### EVIDENCE BASED ON HYPNOSIS

The intended victim in the first attempted rape was not able to identify the defendant through a photographic lineup. This identification was "refreshed" by the use of hypnosis. Two other witnesses identified the defendant in court, one after being hypnotized. The other witness identified the defendant in court without being hypnotized.

The person who hypnotized the witness was Deputy Sheriff Fred Fiore. Deputy Fiore had attended the Modern Hypnosis Instructional Center in Phoenix, the Law Enforcement Hypnosis Investigation Center in Los Angeles, and the Advanced Seminar in Law Enforcement Investigation in Hypnosis in California. Although he had been a Deputy Sheriff for over sixteen and one-half years, he had been using hypnosis at the Sheriff's Office for about a year. Deputy Fiore was a member of the Arizona Hypnosis Investigators Association and the Arizona Society for Professional Hypnosis.

The deputy testified that he used hypnosis for the "enhancement of recall" and for identification purposes. Deputy Fiore testified he used the TV technique, asking the subject to visualize a picture on a television screen. He stated:

"The TV technique is used to give the subject that you're dealing with an area for concentration. And it's also used to make that individual as if he is disassoci-

ated from the act itself. It's used to eliminate emotional trauma or excitability. By having him just—like they're seeing it on a television screen with video tape, that they had previously seen."

Regarding the victim of the attempted rape, the deputy testified concerning her identification of defendant in a photographic lineup after she was first hypnotized:

"Q Now, I show you once again Exhibit 22 in evidence. Is this, to the best of your knowledge, the line-up that was shown?

"A Yes, it was.

"Q Okay. And could you demonstrate or explain how it was shown to _____?

"A It also was folded under and placed in front of her, like that.

"Q Okay. Now, you placed it facing me. But it was facing her, is that correct?

"A Yes. She looked at the line up, and I kind of watched her eyes to see how she was doing. She kind of went across the top row. Of course, this is sitting down lower like this here. And she went across the top of the row and she went across the bottom row. And she reviewed—looking at the right hand side she reviewed them both. And then she made an identification on number 6.

"Q Okay. And what happened then?

"A She was then placed into hypnosis.

"Q Okay. Why did you place her back into hypnosis?

"A She showed some hesitancy on making her identification. And I wanted to have her re-review the individual for a better comparison.

"Q Okay. Now when you say 're-review the individual,' you mean the individual that she had earlier envisioned at the scene?

"A Yes.

"Q All right. And can she also then envision the photographic line up?

"A Yes, she can.

"Q Now, does she see the photographic line up, physically?

"A No. She has her eyes closed and she's reviewing the individuals on her mental screen. And she's also reviewing the photo line up also on her mental screen.

"Q Now, you put her back under, and when you put her back under, what happened?

"A I asked her to review the individual. She paused and said, 'That's the wrong man.' I then asked her to review the photo line up and she said, 'It's the one above on the end.' I asked her if she could see a number. And she told me it was number 3 at that time or right shortly after it. And then she was brought out of hypnosis.

\*　　\*　　\*　　\*　　\*　　\*

"Q Now, was she shown then the photo line up when you brought her out?

"A Yes, she was.

"Q What happened?

"A She reviewed the entire line-up again and pointed to 3 and said that was the individual."

■ There was no expert testimony regarding the effect of hypnosis upon a person's memory, and we do not know from the record what effect the previous hypnotic identification had on the witness's later in-court testimony and identification. Although we perceive that hypnosis is a useful tool in the investigative stage, we do not feel the state of the science (or art) has been shown to be such as to admit testimony which may have been developed as a result of hypnosis. A witness who has been under hypnosis, as in the case here, should not be allowed to testify when there is a question that the testimony may have been produced by that hypnosis. We believe that it was error for the court to allow the alleged victim in the prior rape, as well as the one witness, to testify after being hypnotized for that purpose.

We do not believe, however, that we need to reverse. The evidence more than supports the conviction. The testimony of the victim, but more importantly the testimony of witnesses to her screams at the time of the arrival of the members of the police force, convinces us that the evidence indicates that the result would have been, beyond a reasonable doubt, the same regardless of the identification by the two people involved. The error is not reversible. *State v. Anderson*, 110 Ariz. 238, 517 P.2d 508 (1973).

### EXCESSIVE SENTENCE

 Defendant next contends that his sentence was excessive. Although we have the power to reduce the sentence on appeal, A.R.S. § 13–4037(B), formerly A.R.S. § 13–1717(B), we will exercise this power only with great caution. *State v. O'Neill*, 117 Ariz. 343, 572 P.2d 1181 (1977); *State v. Malory*, 113 Ariz. 480, 557 P.2d 165 (1976). If a sentence is within the statutory limits, the sentence will not be modified or reduced unless, from the circumstances, it clearly appears the sentence was an abuse of the trial court's discretion. *State v. Ethington*, 121 Ariz. 572, 592 P.2d 768 (1979); *State v. Herro*, 120 Ariz. 604, 587 P.2d 1181 (1978); *State v. Patton*, 120 Ariz. 386, 586 P.2d 635 (1978); *State v. Bell*, 113 Ariz. 279, 551 P.2d 548 (1976). We find no such abuse of discretion in this case.

Judgment and sentenced affirmed.

STRUCKMEYER, C. J., and HAYS and GORDON, JJ., concur.

HOLOHAN, Vice Chief Justice, concurring.

I concur in the result.