661 P.2d 1138

**STATE of Arizona, Appellant,**

v.

**Richard F. YOUNG, Appellee.**

**No. 1 CA–CR 4956.**

Court of Appeals of Arizona,
Division 1, Department B.

Dec. 28, 1982.

Rehearing Denied Feb. 28, 1983.

Review Denied March 29, 1983.

Robert K. Corbin, Atty. Gen. by William J. Schafer III, Chief Counsel, Crim. Div., Michael D. Jones, Asst. Atty. Gen., Phoenix, for appellant.

Thomas A. Thinnes, P.A. by Thomas A. Thinnes, Eleanor L. Miller, Phoenix, for appellee.

## OPINION

GRANT, Judge.

This is an appeal by the State of Arizona from two pretrial orders entered by the trial court. The first order precluded the state's primary witness to the homicide from testifying because she had been placed under hypnosis. The second order granted the motion of defendant to suppress all evidence found at the scene of the homicide other than the victim's body.

The facts leading to defendant's indictment for first degree murder reflect that on the evening of October 26, 1978, the defendant and the victim, Donald Jason, engaged in a physical fight in the Leprechaun Lounge in Phoenix, Arizona. The fight stopped when a barmaid, Diana Armstrong, threatened to call the police. Defendant, who was the head bartender, walked behind the bar, took out a pistol and shot the victim in the chest. When the victim turned and staggered towards a restroom, the defendant fired a second shot into the victim's back. The victim fell to the floor fatally wounded.

The owner of the bar, Grace Gillespie, called the police and reported the shooting. Before the police arrived, the defendant wrapped the pistol in a handkerchief and hid it behind a tile of the bar's dropped ceiling. Two police officers arrived a few minutes later, secured the scene and waited until homicide detectives arrived before gathering any physical evidence.

Approximately one hour after the scene was secured, homicide detectives conducted a search of the bar and took photographs of the scene. When one of the officers noticed a portion of a handkerchief hanging down from the ceiling, he moved the ceiling tile and retrieved the hidden pistol.

Subsequent to the homicide, Diana Armstrong made eight separate statements including one on November 21, 1978, when she was placed under hypnosis by a police detective trained in the use of hypnosis. Prior to trial the defendant filed a motion *in limine* seeking to preclude the state from calling Diana Armstrong as a witness at trial because of the potential taint resulting from the hypnosis. The trial court granted the motion based upon *State v. La Mountain,* 125 Ariz. 547, 611 P.2d 551 (1980).

The defendant also filed a pretrial motion to suppress the pistol, the handkerchief, shell casings and photographs taken at the scene on the ground that no search warrant had been obtained after the homicide scene was secured as required by *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). The state responded that the motion to suppress was untimely filed, that the search was conducted pursuant to the owner's consent and that the defendant suffered no personal fourth amendment violation as required by *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The trial court found that the state had not met its burden of showing that the search was lawful and therefore granted the defendant's motion to suppress.

## I. HYPNOSIS ISSUE

The state's first argument on appeal requests this court to limit the cases of *State v. La Mountain, supra,* and *State v. Mena,* 128 Ariz. 226, 624 P.2d 1274 (1981) to their facts and not adopt a *per se* rule precluding a witness from testifying after hypnosis has been used to refresh the witness's memory. At the time of the hearing below, the only Arizona Supreme Court opinion dealing with hypnosis was *State v. La Mountain.* In that case the supreme court stated:

Although we perceive that hypnosis is a useful tool in the investigative stage, we do not feel the state of the science (or art) has been shown to be such as to admit testimony which may have been developed as a result of hypnosis. A witness who has been under hypnosis, as in the case here, should not be allowed to testify when there is a question that the testimony may have been produced by that hypnosis.

125 Ariz. at 551, 611 P.2d at 555. The supreme court held in *La Mountain*, however, that the admission of hypnotically-refreshed testimony in that case was harmless because the evidence against the defendant was overwhelming. *La Mountain* thus did not require absolute preclusion of testimony by witnesses who had been hypnotized as that rule was subsequently set forth in *State v. Mena, supra,* nor did it follow the modified rule as set forth in *State ex rel. Collins v. Superior Court,* 132 Ariz. 180, 644 P.2d 1266 (1982) (supplemental opinion filed May 4, 1982).[1] In *Collins II* the Arizona Supreme Court relaxed the rule of absolute preclusion of hypnotized witnesses' testimony enunciated in *Mena* and *Collins I,* to allow a previously hypnotized witness to testify to the extent of his pre-hypnotic recall, provided that this pre-hypnotic recall had been appropriately recorded before hypnosis, and the hypnosis procedures were performed in a manner designed to minimize the danger of contamination of both pre-hypnotic and post-hypnotic recall.

We must consider then whether the law on hypnotic testimony as developed in *Mena* and *Collins I and II* should be applied to this case. In addressing the retroactivity question in *Collins I* the supreme court held as follows:

> We hold that any person hypnotized post-*Mena* is incompetent to testify. Any person hypnotized pre-*Mena* but who testified post-*Mena* or who has not yet testified is incompetent to testify. We further hold that any conviction presently in

the appeals process in which there was hypnotically recalled testimony and where the testimony and hypnosis took place pre-*Mena* will be examined on a case-by-case basis to determine if there was sufficient evidence, excluding the tainted testimony, to uphold the conviction. In other words, the question in these cases is whether the introduction of posthypnotic testimony was harmless error.

132 Ariz. at 190, 644 P.2d at 1276. In this case, the hypnosis took place pre-*Mena,* and the witness has not yet testified. Therefore, it appears that *Collins I* would require that the witness be precluded from testifying.

The issue, however, is further complicated when the supreme court's subsequent decision in *Collins II* is considered. Surprisingly, the opinion in *Collins II,* unlike *Collins I,* completely omits any discussion of whether *Collins II* is to be given limited retroactive application.

In his dissent in *Collins II,* Justice Gordon "[presumes] because the majority failed to address the prospective/retrospective application of the rule it sets today that the holding is prospective only," citing his discussion of this question in the majority opinion in *Collins I.* We assume that by this comment Justice Gordon is suggesting that the prospective/retrospective line drawing be done in accordance with the above-quoted guidelines which he developed in *Collins I* and which he recognized as "not purely prospective." In our opinion these guidelines might more properly be characterized as contemplating the application of a limited retroactive standard. Thus, the application of *Collins I* would be prospective only in the sense that it would not be applied so as to invalidate convictions which have become final. On the other hand, it would apply to convictions which have not become final because of pending appeals. To that extent it would be given a limited retroactive effect in accordance with the

1. The original Collins opinion will be hereafter referred to as "*Collins I*", and the supplemental opinion as "*Collins II.*"

general rule that when there is a change of law by judicial decision between the time of trial and appeal, the appellate court will dispose of the appeal according to the law prevailing at the time of the appellate disposition. *Arnold v. Knettle,* 10 Ariz.App. 509, 460 P.2d 45 (1969).

■ From the foregoing we conclude that in this appeal we must review the record and apply the principles developed in *Collins II.*[2] Pursuant to *Collins II,* a hypnotized witness can testify to matters she was able to recall and relate to the authorities prior to hypnosis if the foundational requirements of *Collins II* have been established. In our opinion there is implicit in *Collins II* a requirement that the issue of admissibility of pre-hypnotic recall be presented to the trial court for determination prior to the admission of testimony. This issue has not yet been presented to the trial court. It is clear however that *Collins II* prohibits the introduction of statements made during or after hypnosis. In *Collins II,* the supreme court stated that failure to so limit the testimony of the hypnotized witness would be reversible error if prejudicial. Therefore, as to this issue the order of the trial court precluding Diana Armstrong from testifying as to matters contained in statements made during or post-hypnosis is affirmed. However, Diana Armstrong may testify to pre-hypnosis statements if the trial court determines such testimony meets the requirements set forth in *Collins II* as we have applied it to this case.

The defendant also claims that the state waived the right to appeal the hypnosis issue. We find no support in the record for this contention.

## II.  SEARCH ISSUE

The state's second argument is that the trial court erred in granting the defendant's motion to suppress. The state argues that the motion to suppress was not filed within the time limits of rule 16.1(b), Rules of Criminal Procedure, that the warrantless search was authorized by the owner's consent and that the defendant suffered no personal fourth amendment violation.

■ Under *Mincey v. Arizona,* it is clear that once the homicide scene had been secured, the police were without authority to conduct a general search of the premises without a warrant absent either consent or some other recognized exception to the warrant clause of the fourth amendment. We agree with the trial court that the evidence does not support a finding that the owner, Grace Gillespie, consented to a wholesale search of the premises merely by calling the police to the homicide scene or because the bar was a public establishment. As stated in *Lo-Ji Sales, Inc. v. New York,* 442 U.S. 319, 329, 99 S.Ct. 2319, 2326, 60 L.Ed.2d 920, 930 (1979):

> The suggestion is that by virtue of its display of the items at issue to the general public in areas of its store open to them, petitioner had no legitimate expectation of privacy against a governmental intrusion, see *Rakas v. Illinois,* [citation omitted], and that accordingly no warrant was needed. But there is no basis for the notion that because a retail store invites the public to enter, it consents to wholesale searches and seizures that do not conform to Fourth Amendment guarantees.

*See also Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966). While Mrs. Gillespie consented to the initial entry, there is nothing to support an inference of consent to search the ceiling.

■ We agree with the trial court's obvious conclusion that the defendant had a legitimate expectation of privacy against governmental intrusion into the bar or the dropped ceiling. *See Rakas v. Illinois, supra.* In *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) the supreme court expanded on the reasonable expectation of privacy test announced in *Rakas.* The court stated that the test in-

---

**2.** Our conclusion in this regard is fortified by the Arizona Supreme Court's most recent opinions dealing with hypnosis issues, *State v. Stolp,* 133 Ariz. 213, 650 P.2d 1195 (1982), and *State v. Encinas,* 132 Ariz. 493, 647·P.2d 624.

volves two questions. First, whether the individual, by his conduct, exhibited an actual (subjective) expectation of privacy. Second, whether the subjective expectation of privacy is one that society is prepared to recognize as reasonable, i.e., whether the subjective expectation, viewed objectively, is justifiable under the circumstances.

Here, the defendant exhibited an actual expectation of privacy by the very act of hiding the pistol in the ceiling. Viewed objectively we find that the expectation was justifiable under the circumstances. Both Mrs. Gillespie and the defendant testified that at some time in the future the defendant might take over the business and the lease. At the time of the shooting, defendant was acting as a manager or head bartender and shared control of the premises with Mrs. Gillespie. From the evidence presented the trial court could find that defendant owned the pistol and had a proprietary interest in the bar. Ownership is a strong factor to be considered. *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

In a case quite similar on its facts the United States Court of Appeals for the First Circuit held that a warrantless search of the space above an open ceiling tile in the bathroom of a recently arrested drug suspect's motel room violated the suspect's fourth amendment rights. *United States v. Irizarry*, 673 F.2d 554 (1st Cir.1982). It is clear in the instant case that the premises had been secured therefore no exigent circumstances existed, the gun was not in "plain view", and the state does not propose that this was a search incident to an arrest. The defendant had a legitimate expectation of privacy in the area searched and therefore the exclusionary rule was properly applied. We agree with the trial court that the state failed to offer evidence that any of the items seized were in plain view. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Therefore we have no choice but to affirm the suppression of all evidence seized. With regard to the photographs however, we note that they are generally admissible if the things which they depict may be testified to by a witness. In other words a witness may describe what he saw and illustrate his testimony with photographs. However, the photographs are not admissible by themselves as original or substitute evidence. 23 C.J.S. Criminal Law § 852, *Viliborghi v. State*, 45 Ariz. 275, 43 P.2d 210 (1935); *State v. Snodgrass*, 121 Ariz. 409, 590 P.2d 948 (App.1979); *State v. Kleier*, 69 Idaho 278, 206 P.2d 513 (1949).

The state also claims that the motion to suppress was not timely filed. Rule 16.1, Arizona Rules of Criminal Procedure, provides in part:

b. *Making of Motions Before Trial.* All motions shall be made no later than 20 days prior to the date set for trial. Lack of jurisdiction may be raised at any time.

. . . .

c. *Effect of Failure to Make Motions in Timely Manner.* Any motion, defense objection, or request not timely raised under Rule 16.1(b) shall be precluded, unless the basis therefor was not then known, and by the exercise of reasonable diligence could not then have been known, and the party raises it promptly upon learning of it.

The 20 day requirement in rule 16.1(b), Arizona Rules of Criminal Procedure, has been interpreted to mean that pretrial motions must be filed 20 days prior to the *first trial date.* *State v. Superior Court* (McKinzie), 127 Ariz. 175, 619 P.2d 3 (1980). The resetting of a trial date, pursuant to a continuance, does not change the date by which pretrial motions must be filed, unless the trial court so orders. *Id.*

Appellee was arraigned on May 7, 1979, and his trial date was set for June 21, 1979. The trial court's minute entry dated May 7, 1979, states that the deadline date for all motions was June 1, 1979. Appellee filed his motion to suppress on August 14, 1980, nearly 14 months after the original trial date.

However, the McKenzie opinion was not filed until October 7, 1980, almost two

months later. Under the circumstances of this case and the inherent unfairness of applying *McKinzie* retroactively we conclude that the motion to suppress was timely filed under rule 16.1 as it was then construed. *See State v. Post,* 121 Ariz. 579, 592 P.2d 775 (1979); *State v. Lee,* 25 Ariz. App. 220, 542 P.2d 413 (1975).

The order granting appellee's motion *in limine* regarding testimony of Diana Armstrong is affirmed in part and remanded for further evidentiary hearing. The order granting appellee's motion to suppress is affirmed.

JACOBSON, J., concurs.

RICHARD M. DAVIS, Judge Pro Tem., dissenting in part.

I disagree with my colleagues' conclusion that the gun must be suppressed. In my view, the appellee did not carry the burden of showing that he had what used to be called "standing" and what is now referred to as a reasonable expectation of privacy in the ceiling of the bar, so as to entitle him to the protection of the Fourth Amendment.

Initially, I cannot suppress a comment upon the parties' arguments with respect to *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Apart from the United States Supreme Court's rigid and broadly comprehensive *per se* rule expressed in *Mincey* and some of its antecedents, the search at issue in this case strikes me as a reasonable one. Certainly, this search by police officers summoned to the scene at the behest of the owners and licensee of record to investigate a shooting and killing is a long country mile from the writs of assistance and other intrusive indignities forced upon the colonists which provided the impetus for the Fourth Amendment. As the United States Supreme Court has upon occasion recognized, the Fourth Amendment prohibits only *un*-reasonable searches. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *South Dakota v. Opperman,* 428 U.S. 364, 372–73, 96 S.Ct. 3092, 3098–99, 23 L.Ed.2d 1000, 1007 (1976), quoting the dissenting opinion of Justice Black in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).[1]

I can no more imagine Thomas Jefferson or James Madison acting judicially and favorably entertaining a motion to suppress a similarly found pistol in a tavern in Virginia in the 1790s than I can conceive that a nation so recently descended from Plymouth Rock and Ellis Island requires the application of such a broad and monolithic exclusionary rule to protect the right of domestic and work-place privacy. To me, the application of an exclusionary rule under circumstances like these and in the absence of statutory directive represents an artificial and elitist notion of justice, rather than the common man's quest for equal justice under law. When one considers that the issuance of a search warrant in a case of this nature would be or at least should be immediately obtainable as a matter of right, it seems to me a slavish elevation of formality over substance to hold that this inevitably discoverable[2] weapon cannot be introduced into evidence in the homicide prosecution. And even if the search is to be deemed unreasonable, the interest of society in the orderly and complete presentation of the State's case seems to me under the facts here to outweigh grossly any interests favoring suppression. I realize, however, that these considerations are foreclosed by a fair reading and application of the *Mincey* decision and by *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

*Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), allocated to

---

1. Justice Black stated in his dissent in *Coolidge* that the test of the reasonableness of a search cannot be fixed by "per se" rules. 403 U.S. at 509–510, 91 S.Ct. at 2059–60. Cases such as *Mincey* indicate to the contrary. The tendency toward formulation of per se rules, at least in some areas, carries with it the potential for cutting full inquiry and justice off at the pass. *See, e.g., Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982).

2. The ceiling tile was askew and a cloth material was hanging down from it.

the moving defendant the burden of showing "standing." While *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) changed the focus of inquiry to whether the defendant had a reasonable or legitimate expectation of privacy, the burden of showing the affirmative of this entitlement logically remains with the defendant. *See Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *United States v. Smith,* 621 F.2d 483 (2nd Cir.1980), U.S. *cert. den.* 449 U.S. 1086, 101 S.Ct. 875, 66 L.Ed.2d 812 (1981); *United States v. Miller,* 636 F.2d 850 (1st Cir.1980).

Appellee did not assert that he was an owner of the business. Rather, he acknowledged that Grace Gillespie owned the business. Appellee declined to assert that he was the manager. He described himself as the "head bartender."

Critically, however, the premises in question is a bar, what the English have for years called a public house, or "pub." The bar was open to the public and it appears clear from the briefs and record before us that the dropped ceiling in question was in the public barroom portion of the premises and therefore presumably within open and obvious public view.

A number of the cases involving the assertability of a protectable interest in business premises are discussed in 3 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* § 11.3(d) (1978). *Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968) is a leading case. The focus in business premises cases is sometimes different from that in cases involving residential premises and frequently involves an inquiry into the degree to which others and especially the public are excluded from an area where work is performed.

In *State v. Williams,* 84 N.J. 217, 417 A.2d 1046 (1980), the court upheld the defendant's standing to assert a Fourth Amendment violation where the defendant was the custodian of a tavern and the objectionable search took place in a storage room where he kept his tools. The court took pains to note that the area was not open to the public.

As the majority notes, the question before us is two-fold: first, whether the individual exhibits an actual or subjective expectation of privacy; and second, whether the subjective expectation of privacy is one that society is prepared to recognize as reasonable. *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

Here, I can readily agree with the majority that the defendant exhibited a subjective expectation of privacy. I disagree, however, that the second prong of the test has been met. Had the defendant chosen the cash register or perhaps a drawer or cupboard or other receptacle behind the bar in which to place the weapon, I could well agree that his expectation of privacy was reasonable and should be honored. But on the record as it is developed here, the question is whether one has a reasonable expectation of privacy in or behind the openly visible "skin" or lining of a public barroom. On the record here, I cannot answer that question in the affirmative. It seems to me that the defendant's use of the publicly visible ceiling stands out like a sore thumb, and negatives the reasonable expectation of privacy that would attach to other parts of the premises.

*United States v. Irizarry,* 673 F.2d 554 (1st Cir.1982), cited by the majority, involved a temporary residence, i.e., a motel room. The public did not have the right to be present in and observe the room, or its bathroom.

I agree with the majority in their disposition of the hypnosis issue, and in their conclusion that appellee's motion to suppress was timely. I disagree with and dissent from the majority's conclusion that the gun must be suppressed.

NOTE: The Honorable RICHARD M. DAVIS, a Judge *pro tempore* of a court of record, has been authorized to participate in this matter by the Chief Justice of the Arizona Supreme Court, pursuant to Arizona Const. art. VI, § 20.