754 P.2d 340

The **STATE** of Arizona, Petitioner,

v.

The Hon. Lawrence **FLEISCHMAN,** Judge of the Superior Court of the State of Arizona, In and For the County of Pima, Respondent,

and

Alfonso **SCHEMBRI, Real Party in Interest.**

No. 2 CA–SA 88–0053.

Court of Appeals of Arizona, Division 2, Department B.

April 25, 1988.

Review Denied June 1, 1988.

Stephen D. Neely, Pima Co. Atty. by Rick A. Unklesbay, Tucson, for petitioner.

Lieberthal & Kashman, P.C. by Howard A. Kashman, Tucson, for real party in interest.

LIVERMORE, Presiding Judge.

This special action was taken from the trial court's order granting the real party in interest's motion to suppress. For the reasons set forth in this opinion, we accept jurisdiction and grant relief.

## FACTS

Alfonso Schembri, the real party in interest, and his wife Isabel were the owners of a restaurant on East 22nd Street in Tucson. At approximately 3:35 p.m. on August 17, 1987, Schembri found his wife lying on the floor of the restaurant. He immediately went to the Dairy Queen next door where he told an employee, Jessica Hernandez, "My wife was killed, they killed my wife." A telephone call was then placed on the 911 emergency line. The trial court found that the call was either made by Schembri himself or by Hernandez at his request. The transcript of the 911 call indicates that Hernandez spoke first to the operator, who transferred her to the police. She then put Schembri on the phone with the police officer, who continued to talk to him until the police arrived at the scene.

The first two officers, Spillman and Arnold, arrived at the Dairy Queen and went into Schembri's restaurant where they found Mrs. Schembri on the floor lying in a pool of blood. The officers made an initial sweep of the premises to determine whether anyone else was present and observed a floor safe with its top off and bank bags inside. They secured the premises and waited for homicide detectives to arrive. Schembri was visibly distressed during this period, and police officers remained with him following their initial sweep and did not permit him to re-enter the restaurant.

As other officers, as well as members of the news media, arrived to investigate the scene, Schembri was taken to an eastside police station for questioning by two detec-

tives, Myers and Lowe. He was later taken to his home, and then to the main police station to obtain fingerprints for comparison purposes.

After Schembri was taken from the scene, an intensive but apparently routine two-hour investigation of the restaurant premises was conducted by the homicide detectives. The contents of the open safe were removed, inventoried and photographed, and the cash register was opened. Eighty-seven photographs were taken of the scene, a diagram was made and various measurements were taken. Latent fingerprints were also lifted from various items and places in the restaurant. Schembri was not returned to the restaurant until several hours later, when the investigation had been completed. It is the evidence obtained during this investigation by the homicide detectives that was the subject of the motion to suppress.

## PROPRIETY OF SPECIAL ACTION RELIEF

■ Schembri argues that we should decline jurisdiction because the state has "an equally plain, speedy, and adequate remedy by appeal," Ariz.R.Proc.Spec.Actions 1, 17A A.R.S., citing *State v. Million*, 120 Ariz. 10, 583 P.2d 897 (1978). In *Million*, the supreme court discussed the procedure for obtaining appellate review of a suppression order in the context of a claimed speedy trial violation. The court noted that when such a motion has been granted, "the State ha[s] an option of going to trial without the suppressed evidence or allowing the case to be dismissed and appealing the ruling." *Id.* at 13, 583 P.2d at 900.

When the State desires to appeal from an adverse ruling of the trial court on a motion to suppress, the State does not have the right to suspend the trial and the running of the speedy trial rule requirement while an appellate court rules on its appeal. Absent a stay granted by the appellate court in those rare instances where it is appropriate, the State may not leave the defendant in limbo or in custody while it pursues the right of appeal. . . .

*Id.* at 14, 583 P.2d at 901. Since *Million*, the courts and the bar have implicitly assumed that special action is not an appropriate means of seeking appellate review of a suppression order. *See State v. Kozlowski*, 143 Ariz. 137, 692 P.2d 316 (App.1984); *State v. Eason*, 124 Ariz. 390, 604 P.2d 654 (App.1979).

*Million* does not foreclose special action relief, however, and two considerations in this case militate in favor of this method of appellate review. First, the primary concern of the *Million* court was the violation of a defendant's speedy trial rights caused by the delay associated with appellate review. Because this court's decision will have been rendered prior to the trial date in this case, that is not a factor here. Second, the language of *Million* quoted above indicates that the supreme court clearly anticipated that extraordinary circumstances might arise where it would be appropriate to stay a criminal trial in order to review a suppression order. We believe such extraordinary circumstances are present in a first degree murder case where there is a significant risk that the accused will flee upon his release from custody. In the present case, finding that such a risk was present, the trial court set Schembri's bond at $225,000. Both of these considerations lead us to conclude that *Million* does not preclude review of this order by way of special action.

## THE SUPPRESSION ORDER

Following a hearing, the trial court entered an underadvisement order granting the motion to suppress in part. The court found that the only possible basis for the warrantless search of the restaurant was Schembri's consent. The court further found that, by telephoning the police, or requesting that they be telephoned, Schembri "waived certain privacy expectations." The court concluded, however, that this waiver or consent was "limited to the initial police intrusion, not the in-depth ransacking and cataloging of his business." Citing the Supreme Court's decision in *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the court ruled that

once the initial intrusion to determine the condition of the victim and to secure the premises was completed, the police were required to obtain a warrant before conducting any further search.

The trial court also relied on the decision of Division One of this court in *State v. Young*, 135 Ariz. 437, 661 P.2d 1138 (App. 1982), in concluding that Schembri's consent did not extend beyond the initial entry and search by the police. In *Young*, the defendant was the manager of a bar owned by Grace Gillespie. Young shot a customer during an altercation at the bar, and Gillespie telephoned the police. Before their arrival, Young attempted to hide the gun in the ceiling. As in this case, two police officers arrived immediately, secured the scene and waited for homicide detectives to arrive before gathering any evidence. During the subsequent search by detectives, the gun was discovered. Division One held that the owner did not consent to a search of the entire premises merely by calling the police and that Young had a reasonable expectation of privacy requiring a warrant for the subsequent search.

Based on *Mincey* and *Young*, the trial court in this case ordered suppression of any evidence other than those items which were in plain view at the time of the initial sweep by Officers Spillman and Arnold.

## VALIDITY OF THE WARRANTLESS SEARCH

In *Mincey v. Arizona, supra*, the United States Supreme Court rejected the concept of a "murder scene" exception to the warrant requirement of the Fourth Amendment, holding that the police could not conduct a general search of the home of the suspect without a warrant unless the search could be justified under one of the recognized exceptions to the warrant requirement. In that case, although the initial entry was justified by exigent circumstances, the Court held that once the premises were secured neither those circumstances nor any other exception could be used to justify the continuation of the search.

In the present case, Schembri concedes that the initial entry of the restaurant was justified by the need to determine the condition of Mrs. Schembri, to ascertain whether the perpetrator was still present and to secure the premises. Having accomplished those objectives, however, Schembri contends that there was no basis for the subsequent warrantless search conducted by the homicide detectives. The state argues that by reporting his wife's murder to the police, Schembri gave implied consent not only to the initial search but also to the subsequent investigation by the homicide detectives.

We agree with the state and the trial court that, by reporting to the police that his wife had been killed, Schembri gave at least implied consent to the initial entry by Officers Spillman and Arnold. *See State v. Tucker,* 118 Ariz. 76, 574 P.2d 1295 (1978). We also agree that evidence obtained in the subsequent investigation by the homicide detectives, other than that which was in plain view during the initial search,[1] is admissible only if that consent can be found to extend beyond the initial sweep. Thus the issue before us is the scope of Schembri's implied consent.

Although a number of post-*Mincey* decisions have addressed the issue of the scope of a consent to search based on the report of an offense to the police, most have involved factual differences which render them of little assistance in this case. Either the evidence was observed during the initial search and was admissible under the "plain view" exception, *see, e.g., People v. Reynolds*, 672 P.2d 529 (Colo.1983); *State v. Jolley*, 312 N.C. 296, 321 S.E.2d 883 (1984); *Ortega v. State*, 669 P.2d 935 (Wyo. 1983), or the defendant was present and either consented to the additional search or did nothing to revoke his initial consent,

---

1. Schembri does not contest the admissibility of photographs taken of evidence in plain view. *See State v. Young*, 135 Ariz. 437, 661 P.2d 1138 (App.1982); *People v. Reynolds*, 672 P.2d 529 (Colo.1983); *Ortega v. State*, 669 P.2d 935 (Wyo.

1983). *Ortega* also holds that admission of photographs and diagrams of a murder scene may be supported by the exigent circumstances exception to the warrant requirement. In light of our holding, we do not address this issue.

see, e.g., *Hubbard v. State*, 382 So.2d 577 (Ala.App.1979); *Phillips v. State*, 625 P.2d 816 (Alaska 1980); *State v. Dowling*, 387 So.2d 1165 (La.1980).

In *Zeigler v. State*, 402 So.2d 365 (Fla.1981), the defendant murdered his wife and her parents at his place of business, staging the offenses as a robbery, then shot himself and called the police. The court held that the telephone call was an invitation to police, and that "[t]hat invitation removed any application of *Mincey*" to a subsequent week-long investigation and search of the scene. *Id.* at 372. *See contra, People v. Annerino*, 97 Ill.App.3d 240, 52 Ill.Dec. 714, 422 N.E.2d 923 (1981) (defendant's report of fatal shooting at his house and request for police assistance was not a consent to search crawl space for bullet, where marijuana forming the basis of a subsequent prosecution was found). While we do not necessarily agree with the conclusion of the *Zeigler* court as to the scope of the implied consent found in that case, we agree with the rationale implicit in that decision. When a crime is reported to the police by an individual who owns or controls the premises to which the police are summoned, and that individual either states or suggests that it was committed by a third person, he or she implicitly consents to a search of the premises reasonably related to the routine investigation of the offense and the identification of the perpetrator. So long as that individual is not a suspect in the case or does nothing to revoke his consent, the police may search the premises for these purposes, and evidence obtained thereby is admissible. *State v. Young, supra*, is distinguishable in that the defendant in that case was a suspect from the outset of the investigation.

In the present case, there is nothing in the record which even suggests that Schembri was a suspect at the time the homicide detectives began their investigation, or that he became a suspect until after that investigation had been completed. Although Schembri was removed from the scene before the investigation began, the police had no reason at that time to consider him a suspect, and he neither said nor did anything to indicate that he did not want the police to enter the restaurant or continue their investigation. To the contrary, the record indicates that he willingly spoke with the police and gave further assistance by taking them to his house and providing them with his fingerprints ostensibly to eliminate him as a suspect. Under these circumstances, we hold that the implied consent to search arising out of Schembri's initial telephone conversation with the police authorized the subsequent investigation by the homicide detectives, and that the evidence obtained during that investigation is admissible. We therefore vacate the trial court's suppression order and remand for further proceedings consistent with this opinion.

FERNANDEZ and HOWARD, JJ., concur.